# SARAH V. MILLER

*vs.*

# JOHN H. MILLER.

*Divorce—Abandonment—Adultery.*

Evidence as to the wife's habits of intoxication *held* to pre-
clude her from asserting the husband's abandonment of her as a
ground of divorce.                                                   pp. 64, 65

That one was under the influence of liquor at the time of
commission by her of adultery is no defense to a bill for divorce
on that ground.                                                          p. 66

*Decided January 11th, 1922.*

Appeal from the Circuit Court of Baltimore City (HEUIS-
LER, J.).

Bill by Sarah V. Miller against John H. Miller and others.
From a decree dismissing the original bill and granting the
prayer of the cross-bill, plaintiff appeals. Affirmed.

The cause was argued before BOYD, C. J., BRISCOE,
THOMAS, PATTISON, URNER, STOCKBRIDGE, and OFFUTT, JJ.

*Moses W. Rosenfeld,* with whom was *Harry B. Wolf* on
the brief, for the appellant.

*Harry L. Denny* and *W. H. Surratt,* for the appellee.

THOMAS, J., delivered the opinion of the Court.

On the 2nd of September, 1920, the appellant filed a bill
of complaint in the Circuit Court of Baltimore City alleg-
ing that she and the defendant, John H. Miller, were mar-
ried in December, 1902, and lived together until August
22nd, 1919; that they had one child, Frederick Menges
Miller, about thirteen years of age; that notwithstanding her

conduct towards the defendant had always "been kind, affectionate, chaste and above reproach," he, "without any just cause or reason," abandoned and deserted her; that about the 23rd of December, 1919, the defendant left Baltimore City and went to Reno, in Washoe County, in the State of Nevada, for the purpose of securing a divorce from her, and had filed a bill for divorce in said county and state charging her with cruelty, believing that the appellant would not, because of the expense, be able to defend the suit; that the appellant had taken steps to defend the suit, and intended to contest the same. After further alleging that the defendant was a non-resident of the State of Maryland; that the property in which they had lived on Park Heights Avenue, in Baltimore City, and in which she was still living, stood in the name of the defendant; that he owned about one-half of the stock of the Miller Brothers Restaurant, Incorporated, which owned the property and was engaged in the restaurant business at 117 West Fayette Street; the bill prayed for a divorce *a mensa et thoro,* for the custody of the son, for alimony and counsel fees, for an injunction restraining the defendant from conveying the property on Park Heights Avenue, and restraining said corporation and John H. Miller, Frederick W. Miller and Thomas B. Harper, the stockholders thereof, from transferring any of the stock belonging to the defendant or paying to him any money due him, and for the appointment of a trustee to sell said stock and collect said money, etc., and for general relief. An order was passed appointing a trustee and restraining the defendants as prayed in the bill.

On the 29th of September, 1920, the defendant answered the bill, denying that the plaintiff's conduct towards him had been as averred in her bill, and alleging that she, on or about the 22nd of August, 1919, abandoned and deserted him "in that by her vicious and depraved conduct, and by her constant exhibitions of brutal temper and cruel and inhuman treatment" of him, he was compelled to live apart from her:

that he instituted divorce proceedings against her in Nevada, and that his purpose in seeking the jurisdiction of the courts of that state was to save, as far as possible, his infant son from the disgrace of the disclosures necessary in a divorce proceeding in the State of Maryland; that at the time of the filing of the bill in this case he was a resident of the State of Nevada, but that at the time of filing his answer he was a resident of Maryland and of the City of Baltimore; that for a period of eight or ten years prior to the filing of the bill the plaintiff "indulged in vicious and immoral practices"; that she "became confirmed, particularly in her drinking habits"; that she "entertained, received and associated with company which were not fit for the wife of" the defendant, and that many of "the indulgences he offered her" were efforts on his part to wean her away from "vicious associates and to restrain her habits, in all of which" his efforts were fruitless.

On the 11th of October, 1920, the defendant filed a cross-bill against the plaintiff, in which he alleged that she had, prior to the filing of the cross-bill, committed the crime of adultery "with divers lewd and abandoned men," whose names at that time were unknown to him, and praying for the custody of his child, and for a divorce *a vinculo matrimonii* from her. The cross-bill was answered by the defendant, therein denying the alleged adultery, etc.

The trial of the case in the court below consumed more than eight days, and the evidence covers about six hundred pages of the printed record. The learned chancellor, who heard the evidence, and who had an opportunity to observe the conduct of the witnesses on the witness stand, after argument of counsel, and a full review of the testimony in the opinion set out in the record, reached the conclusion that the charges made in the cross-bill had been satisfactorily established, and accordingly passed a decree dismissing the original bill, dissolving the injunction, requiring the trustee to turn over the property to the defendant, awarding the custody of the son to his father, subject to the right of Mrs.

Miller to visit him at "reasonable times," and granting the plaintiff in the cross-bill an absolute divorce from the defendant therein. The present appeal is from that decree.

While we have examined the evidence in the case with great care, an attempt to discuss it at length could serve no good purpose and would extend our opinion beyond any reasonable limit. It will be sufficient to refer to some of the more important features, and to state the conclusion reached after a careful consideration of the record.

Mr. and Mrs. Miller, at the time of their marriage in 1902, lived in Washington, D. C. At that time he had no means, and was working for the Havener Bakery Company, driving a bread wagon. Shortly after their marriage they purchased a little two-story house on 13th Street, S. E., on which they paid fifty dollars and the balance in instalments of fifteen dollars per month, and Mrs. Miller's mother and her sister, Leola Marr, now Mrs. Wehr, who was then a young girl, lived there with them as members of the family. In 1905, Mr. Miller and his brother, Frederick W. Miller, received some money left them by their aunt, and they purchased the property known as 502 Ninth Street, N. W., a three-story building, and started the restaurant business there, and Mr. Miller and his family moved their home to the second and third stories of the building. The business on Ninth Street proved to be a success, and Mr. Miller and his brother made a good deal of money. In 1910, Mr. Miller purchased a suburban home on the Rock Creek Church Road for $6,000, and had it conveyed to Mrs. Miller. He furnished the house, paying as much as $1,000 for one suit of furniture, and they lived there until 1916. In 1914, Mr. Miller and his brother purchased the property, 117 West Fayette Street, in Baltimore City, now known as the property of the Miller Brothers' Restaurant, Incorporated, and began the restaurant business there. After the purchase of the Fayette Street property Mr. and Mrs. Miller continued to live in Washington, Mr. Miller spending about one-half of each week in Baltimore,

until 1916, when they gâve up their home on the Rock Creek Church Road and came to Baltimore and rented a house on Garrison Avenue.  In 1917 Mr. Miller purchased the house on Park Heights Avenue, referred to in this case, and he and his family lived there until he left home in August, 1920, for the reasons stated in his answer to the original bill.

Some time after they went to the Ninth Street property to live, Mrs. Miller became subject to what were then said to be nervous spells, requiring frequent medical attention.  During these spells she was irritable and cross, but her mother, who was still living and keeping house for them, exercised some restraint upon her, and nothing occurred to mar the relations existing between her and Mr. Miller.  After her mother died in 1909, Mr. Miller says, "what little difference seemed to exist between Mrs. Miller and her mother seemed to fall on" him, "and it got from bad to worse."  The doctors had told Mr. Miller that the attacks to which Mrs. Miller was subject were nervous attacks, and he had accepted that explanation, but shortly after they moved into the house on the Rock Creek Church Road she became at times so hysterical and wild that he finally discovered that her condition was due to the fact that she was drinking.  The evidence shows that from that time on Mrs. Miller's habits became worse, and that her spells of intoxication became more frequent and pronounced; that Mr. Miller, with the view of helping her to overcome her desire for liquor, was very indulgent with her, doing what he could to please her, and took her and their son on long trips for the purpose of getting her away from bad associates and tempting surroundings, but that all of his efforts in that direction failed; that when she was under the influence of liquor she was spiteful, vicious, and cruel, and her language vulgar and profane, and that her conduct and habits became so bad, and her attacks upon Mr. Miller became so frequent and bitter, that he finally determined, in August, 1920, to leave her.  This evidence is denied by Mrs. Miller, and also by her sister, Mrs. Wehr, who at the time of

the trial was making her home with Mrs. Miller, but their testimony is not sufficient to overcome the great weight of the evidence in support of the facts to which we have referred.

This brings us to the charge of adultery in the cross-bill. Two incidents are relied on in the record to establish that charge. The first occurred in Washington, at the home of Mrs. Grimes, Mrs. Miller's sister, in May, 1918, and the second at Mrs. Miller's home on Park Heights Avenue, in June, 1919. It is not disputed that the facts shown by plaintiff's witnesses are sufficient to establish the charge of adultery, but it is earnestly contended on the part of the appellant that the plaintiff's evidence is "fabricated" and unworthy of belief. The evidence as to what occurred in May, 1918, rests primarily upon the testimony of Mrs. Miller's sister, Mrs. Grimes, and Mr. Grimes, who give in detail the circumstances under which Mrs. Miller, her companion in the offense alleged, and others met at their house in Washington on that occasion; what Mrs. Grimes saw that night when she returned from the station where she had gone to take Mrs. Wehr, and what both she and her husband saw later in the night when they returned home after Mr. Grimes, who was on the police force, was relieved from duty. This evidence is denied by Mrs. Miller and also by Mrs. Wehr, who state that Mrs. Miller left Mrs. Grimes' house that night before Mrs. Wehr left. But the fact that the party took place at Mrs. Grimes' that evening, and that the other persons mentioned by Mrs. Grimes were present, is not denied. If Mr. and Mrs. Grimes were engaged in the manufacture of evidence to aid Mr. Miller, it is rather strange that they should have selected an occasion when others were present who could contradict them. Mrs. Miller was not an infrequent visitor to Washington, and they could easily have adopted some other time or occasion when there was no one to challenge their testimony except the parties accused. Moreover the man, with whom Mrs. Miller is said to have committed the offense in May, 1918, was a visitor at the Park Heights Avenue

home after Mr. Miller left there in August, 1919, and Mrs. Miller was probably in a better position to know of his whereabouts than any one else connected with the case, and yet he was not produced as a witness to deny the charge made against him.

The incident of June, 1919, is established by the testimony of Mrs. Murray, a niece of Mr. Miller, who was visiting the Park Heights Avenue home at that time. It is urged that the facts relied on in this connection rest entirely upon Mrs. Murray's testimony, and that her evidence was also "fabricated" and should not be credited. But it is admitted by Mrs. Miller that the two men referred to by Mrs. Murray were at her home that night, and Mrs. Murray's testimony as to their presence there, and in regard to Mrs. Miller's condition, is corroborated by the testimony of a neighbor, Mrs. Dunn, whose credibility is in no way impeached, and whose testimony also discloses other circumstances reflecting upon the probability of the truth of Mrs. Murray's statement. In addition to the testimony referred to the record contains other evidence bearing upon the conduct of the appellant on other occasions, and tending to show that the truth of the charge is, at least, not improbable.

As we have said, the evidence was taken before the court, and the experienced judge who heard it had an opportunity to observe the demeanor of the witnesses and to determine the weight to which the testimony of each was entitled. While the burden was on the plaintiff in the cross-bill to establish the adultery alleged, we cannot say on the record before us that he has failed to meet that burden, and that the court below erred in the conclusion it reached. The evidence shows that on both of the occasions referred to Mrs. Miller was under the influence of liquor, and it may be that her shameful conduct was due to her unfortunate condition. But that circumstance cannot relieve her of the consequences of her offense, or deprive her husband of the relief to which he is entitled under the law.

*Decree affirmed, with costs to the appellee.*