OLIVER *v.* OLIVER

[No. 197, September Term, 1957.]

*Decided April 29, 1958.*

*Motion for rehearing filed May 29, 1958, denied June 10, 1958.*

Before HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ., and MACGILL, J., Associate Judge of the Fifth Judicial Circuit, specially assigned.

Submitted on brief by *James C. Christopher* and *John C. Keating* for the appellant.

Submitted on brief by *James H. Pugh* for the appellee.

HORNEY, J., delivered the opinion of the Court.

Thomas F. Oliver (the husband *or* the father) filed a bill in the Circuit Court for Montgomery County (Anderson, J.) against Betty Adams Oliver (the wife *or* the mother) for a divorce *a vinculo matrimonii* on the grounds of abandonment and adultery, and for the custody of their three-year-old daughter (the child *or* the daughter). The testimony was taken by an examiner, and after argument, the chancellor granted the husband an absolute divorce for abandonment, but not for adultery, and awarded custody of the child to the wife, with limited visitation rights to the husband. The husband appealed from the final decree, insisting (i) that there was sufficient evidence to prove adultery, and (ii) that he was entitled to custody of the child.

The parties were married in 1950 and lived together, not entirely harmoniously, until November of 1954, when the wife removed to the home of her mother in Virginia. She took with her the child, who had been born in 1953. The separation was continuous and uninterrupted until the time testimony was taken in 1957, although the husband had made several abortive attempts at reconciliation.

Both the husband and wife had been employees of the federal government. In 1952 the wife became acquainted with Taylor Potter (Potter), a fellow employee, by sharing in a car pool. For a while the husband saw no reason to object to his wife's friendship with Potter. However, after the Olivers separated at the end of 1954, the husband learned that Potter was making frequent visits to his wife at her mother's home. In January of 1955 the wife and child moved into an apartment in Wheaton, Maryland. Although the husband continued to visit them, relations between the parties reached their lowest point in November of 1955 when the wife filed suit for a divorce in Virginia, to which the husband interposed a successful defense. In the meantime, Potter's wife had died and he became a more frequent visitor at the wife's apartment.

At this point, the wife and Potter became involved in a companionship which was not consistent with a normal

friendship between a virtuous woman and a continent man. The husband hired a detective to keep the apartment of his wife under constant surveillance. During March and April of 1956 the detective, his assistant, and the husband often sat in a parked car and watched Potter enter and leave the wife's apartment. One evening, when Potter went to the apartment, the lights went out at about nine o'clock in the evening, and Potter did not leave until after midnight. On another occasion Potter stayed until three-thirty in the morning. By using binoculars, the detectives saw Potter and the wife hugging and kissing in a car. The wife's maid testified that Potter had come to the apartment many times, and had been in the wife's bedroom once when he was not fully clothed. The child began to refer to Potter as "Daddy Taylor," often speaking of "Daddy Taylor's pillow" on the wife's bed, and "Daddy Taylor's toothbrush."

Potter and the wife denied all of the above allegations. Potter, who had moved to Michigan several months before the trial, admitted that he had been to the wife's apartment, but only infrequently, and never when the lights were out. He denied any sexual intimacies with her, describing his relationship as being more of an "older brother" to her. When asked if he had ever kissed the wife, he replied, "No, not that I recall, * * * [except] if I pecked her on the cheek or something I probably would not have recalled it." Because he had moved away, he had seen her only once or twice in the eight months preceding the taking of the testimony—when he had come to Washington on business.

On the issue of the custody of the child, the father contends that the court erred in awarding the daughter to the mother. He insists that because the mother had been guilty of adultery, and because the child had been compelled to live in the same house with the wife and her paramour, he (the father) should have been awarded the custody of the daughter. On the other hand, most of the witnesses believed that the wife was a fit and proper person to have custody of the child. One witness thought the wife was a considerate and loving mother. Another thought that she was "a model mother, * * * dependable, trustworthy, * * * an excellent mother with an

understanding of child development." Because the mother had once been a teacher, it was believed that "her training as a teacher helps." Even one of the husband's witnesses, the wife's maid, thought that the wife was a very good mother and would be a proper person to rear the child. Except for the husband's own testimony, there is no evidence in regard to his fitness and ability to take care of and provide for the daughter if he were awarded custody. But there is nothing to indicate that he is not also a fit and proper person to have such custody, although he offered no definite plan for the care of the child.

The husband elected to sue his wife by joining in one action two independent claims or causes for an absolute divorce—abandonment and adultery—pursuant to Maryland Rule 313 a (Joinder of Claims). The chancellor declined to grant the divorce on the ground of adultery because he was not "convinced beyond a reasonable doubt that the charge of adultery * * * [had] been proven," and granted the divorce on the ground of abandonment because "the evidence * * * [was] clear and convincing that the * * * [wife] abandoned and deserted the * * * [husband]." While we do not agree that adultery must be proven "beyond a reasonable doubt," [1] we are unable to say that the chancellor was clearly wrong in granting the divorce on the ground of abandonment instead of adultery. Moreover, we think the question is unimportant in this case. The real question here is the custody of the child, and a determination of that question does not necessarily depend on the ground for divorce which entitled the husband to a decree. In this case, as in all other cases concerning the custody of children, it is generally the best interests of the child which determine the award of custody.

Even if we assume that the wife did commit adultery, as the evidence in this case appears to indicate, the result so far as present custody is concerned would be the same. In making an award of custody, a court must necessarily take into

---

1. Adultery may be inferred from circumstances which would lead the guarded discretion of a reasonable and just man to a conclusion of guilt. See *Pohzehl v. Pohzehl*, 205 Md. 395, 109 A. 2d 58 (1954), and the cases therein cited.

consideration all of the evidence bearing on the question. The law on the subject is clear. It is the application of the law to the facts in each case that is difficult.

In divorce cases, courts are inclined to award the custody of minor children to the innocent party, but it does not follow as a matter of course that the plaintiff in a divorce action is entitled to custody. The question is within the sound discretion of the chancellor. If, for instance, the child is so young or in such condition of health as to need the care of a mother, particularly if the child is a girl, custody is ordinarily awarded to the mother, at least temporarily, even if the father is without fault. *Madden, Persons and Domestic Relations* (1931), 377-78. And there is no absolute rule that one who has committed adultery is morally unfit to have custody of a child. The circumstances in a particular case may justify awarding a minor child to a parent who has committed adultery. The guilt of a wife may even be overlooked where she is not grossly immoral. *2 Nelson, Divorce and Annulment* (2d ed., 1945), Sec. 15.06.

In *Swoyer v. Swoyer,* 157 Md. 18, 145 A. 190 (1929), a leading case in Maryland, there is an elaborate discussion of the many considerations involved in a child custody proceeding where the wife is guilty of adultery. In that case the custody of the children was awarded to the husband pending further order of the court, even though he was a steady drinker, had no fixed place of abode, and was away on business much of the time, and the wife had been a careful and attentive mother. But, as was therein suggested, no hard and fast rule can be drawn to govern cases of this kind. The welfare and best interests of the children must govern "even though that involves awarding their custody to the parent whose misconduct is the cause of the divorce." Although the husband's character was not beyond reproach, he was awarded custody because, among other things, the wife had continued the adulterous relationship with her paramour until the case was heard.

That the cessation of the adulterous relationship is an important factor is illustrated in *Pekar v. Pekar,* 188 Md. 360, 52 A. 2d 468 (1947), where the decree granted the husband

a divorce for the wife's adultery and awarded him the custody of their eight year old son. The decree was affirmed, primarily because the wife had continued to live with the paramour. In *Pangle v. Pangle,* 134 Md. 166, 106 A. 337 (1919), another case demonstrating the reluctance of this Court to award custody to an adulteress while the paramour still dominates the scene, the wife's adultery resulted in the grant of a divorce to the husband, and an award of the custody of their five year old daughter. Two weeks later, the wife married her paramour, and a few months after that marriage, she petitioned the court for the custody of the child. We denied her custody, saying: "Having lost his wife through her misconduct, he ought not to be deprived of the custody of his daughter and subjected to the humiliation of surrendering her to the support and control of the *author of his marital misfortune.*" (Emphasis added).

Another case illustrating the significance of the cessation of adulterous conduct is *Townsend v. Townsend,* 205 Md. 591, 109 A. 2d 765 (1954). In that case the husband was granted a divorce from the wife in January of 1952 on the ground of her adultery and was awarded the custody of an infant child. In October of 1953 the wife petitioned for a modification of the decree to permit her to have custody of the child. The chancellor denied her any right of visitation with the child except such as the father might allow within his discretion. In reversing the decree we held that the mother, who had ceased her adulterous conduct in 1952, was entitled to visit the child for such periods and under such circumstances as might seem proper to the chancellor. The converse of this situation was presented in *Stimis v. Stimis,* 186 Md. 489, 47 A. 2d 497 (1946), where the wife's custody of the child was subsequently taken away when she began living with the paramour.

All of the evidence, except one deposition, was taken before an examiner, and the chancellor did not have an opportunity to see and hear the parties and other witnesses. After reading all of the testimony, he concluded that the custody of the three-year-old child should be awarded to the mother because it was *not* established that she was an unfit person to have

custody. We are unable to find that the chancellor was clearly wrong in so doing, and we see no reason why the award of custody to the mother should not redound to the best interests of the child. Moreover, since the award of custody was a matter within the sound discretion of the chancellor, we are unable to say that he abused his discretion. The adulterous relationship had ceased, and it is not likely that such illicit conduct will be revived since the former paramour has moved to Michigan and has become interested in marrying another woman out there. The mother having changed her way of life, the chancellor was justified in overlooking her past indiscretions. *Trudeau v. Trudeau*, 204 Md. 214, 221, 103 A. 2d 563 (1954).

Although the chancellor did not specifically retain jurisdiction of the case, it is clear that the lower court "may at any time * * * annul, vary or modify" the decree in relation to the child. Code (1957), Art. 16, sec. 25. If the conduct of the mother should again become improper, custody may be given to the father, if that is deemed best, or to another person or child welfare agency. In the meantime, the chancellor, by the decree, rightfully provided the father with liberal visitation rights and periodic custodial privileges.

> *Decree affirmed, the appellant*
> *to pay the costs.*

PRESCOTT, J., dissenting in part, filed the following dissenting opinion, in which MACGILL, J., specially assigned, concurred.

The majority of this Court has just decided that a wife, who has committed adultery, deserted her husband and broken up their home, is entitled to the custody of their minor daughter, aged nearly five years, in preference to a blameless husband, whose only fault has been that his wife became enamoured with a married man, who became her paramour. There is no contention made that the husband has done anything to forfeit his parental rights: it is conceded that he is a sober, reliable, industrious, attentive father, who maintains a nice home in one of the best residential sections of Montgomery County.

This ruling seems to be a wide departure in policy from an unbroken line of previous decisions of this Court. Among those decisions, see *Hill v. Hill,* 49 Md. 450 (wife committed adultery—custody of a daughter 5 years old awarded to the father—father died—custody awarded to child's aunt) ; *Kremelberg v. Kremelberg,* 52 Md. 553, 566 (wife committed adultery—custody of a son and two daughters awarded to father) ; *Pangle v. Pangle,* 134 Md. 166, 106 A. 337 (wife committed adultery—custody of a daughter 5 years old awarded to father) ; *Poehlman v. Poehlman,* 130 Md. 695, 102 A. 1052; *Swoyer v. Swoyer,* 157 Md. 18, 145 A. 190 (wife committed adultery—custody of daughter 5 years of age and son 7 years old awarded to father) ; *Townsend v. Townsend,* 205 Md. 591, 109 A. 2d 765 (mother committed adultery—son 3 years old awarded to father) ; *Pekar v. Pekar,* 188 Md. 360, 52 A. 2d 468 (wife committed adultery —son 8 years old awarded to father) ; *Stimis v. Stimis,* 186 Md. 489, 47 A. 2d 497.

In the *Pangle* case, *supra,* this Court stated: "But in a case where the custody of a female child is sought by a mother, after a separation caused by her adultery, the evidence should be very clear as to the propriety and wisdom of such a course before the child is removed from the care of the father * * *." In the *Swoyer* case, *supra,* this Court recognized the right of the chancellor to award the custody of the infant children to an adulterous spouse under exceptional circumstances [1] (in the case at bar, the chancellor found the wife had not committed adultery—this Court determined that she had—if the chancellor had found that she had committed adultery, it seems clear that he would not have awarded her the custody of the child), but said: "* * * so far as we know, it has not been exercised in any case found among the reported decisions of this court." This Court then proceeded (157 Md. 33) to

1. Possible exceptional cases of this nature would be where the wife had rectified her conduct and (1) the husband was an invalid or (2) where the child was sickly, needing constant care, and the husband was required to work. In some jurisdictions, however, divorce on the ground of adultery is a conclusive adjudication of the guilty party's unfitness to have custody. *Hanby v. Hanby* (Ala.), 158 So. 727.

award the custody of a daughter 5 years of age and a son of 7 years, in preference to an adulterous mother, to the father who was "a man of extravagant habits, with no permanent or fixed place of abode, who is required by the nature of his business to be absent from his family a great part of his time, that he drinks steadily, and that, if he assumes the custody of the children, much of the time they will necessarily be without the care or companionship of either father or mother."

The above reflects the general tendency of the Courts everywhere. Many such cases are cited in a note to *Re Pryse* (Kan.), 41 L. R. A. (N. S.) 601. See also 2 *Nelson, Divorce and Annulment,* (2 ed.), sec. 15.06; 27 *C. J. S., Divorce,* sec. 309 (e). And the same general rule applies where the misconduct of one spouse is not adultery. *Nelson, op. cit.,* sec. 15.05.

It will be noted in the *Stimis* case, *supra,* 186 Md. 489, mentioned in the majority opinion, the divorce was granted on the ground of desertion when the wife received custody of the child. When adultery was later proved, the custody was taken from her. Also, in the *Trudeau* case, 204 Md. 214, 103 A. 2d 563, where the conduct of the wife *after divorce* was bad, there was no finding that she had actually had sexual relations, and the morals and conduct of the former husband (exactly the opposite to the instant state of facts) were very low.

Usually, where a divorce is granted on the ground of adultery, the custody of the children is awarded to the innocent party, not as a matter of punishment or reward, but because it is assumed that they will be reared in a cleaner and more wholesome atmosphere. However, the natural feelings and legitimate interests of the parents are also to be duly considered. In this case, there is no contention that the father is not a fit and proper person to rear the child; nor is it claimed that he has done anything to forfeit his parental rights. He is regularly employed, has a fixed and proper abode, and is a man of good morals. The only substantial reason given by the majority for denying the father custody is that he has no "definite plan" for the child's care. The father testified his mother lives with him and he was able

to employ some one to care for the child while he was at work at any time his mother could not care for her; and, if the occasion arose when he would be unable to find someone to care for her when he was at work, there are many splendid local schools and kindergartens that specialize in caring for small children while their parents work, in which the child could be temporarily placed when he was at work. (It should be noted that the mother also works; so someone will be required to care for the child during working hours, whoever has her custody.) In *Roussey v. Roussey*, 210 Md. 261, 264, 123 A. 2d 354, this Court said: "In the instant case (custody of a child) we think the possible effect upon the ability of the wife to hold her job should not be controlling. Working mothers are commonplace in the present day and baby-sitters are a national institution. Moreover, in a year or so the younger boy will be of school, or at least kindergarten, age." It seems that this is direct approval by this Court of the plan that the father has for caring for the child.

Of course, no one contends that a spouse who commits adultery is beyond all redemption and forever unfit to rear a child. When the erring one rectifies the immoral conduct and leads an upright life for a sufficient length of time to justify the conclusion that the uprightness will be permanent, and not merely temporary, there is every good reason to believe that such a person can properly rear a child; but this is no reason to penalize a fit parent who has committed no error and has not forfeited his right to the custody of the child. In the instant case, the father is without fault and has been granted a divorce on the grounds of adultery and desertion by the wife; nevertheless, he is required by the majority to pay for the child's support, and, at the same time, to permit his wife, an adjudicated adulteress, to rear his child. This seems an unfortunate and unjustified lot to befall a worthy husband: he must become reconciled to the humiliation of a state of cuckoldry, and a lonely existence by himself with an unfaithful and deserting wife bringing up his daughter, while he is required to pay for the daughter's maintenance. This result will certainly not act as a deterrent to errant mothers who are inclined with adulterous dispositions. It

does not appear from the record that the unchaste wife had the temerity to request alimony in addition to the custody of, and support for, the child; but, perhaps, this will be the next step. See the dissenting opinion in *Courson v. Courson,* 213 Md. 183, 189, 129 A. 2d 917.

I agree with the majority in holding that the evidence impels a finding that the wife committed adultery; but believe that the previous decisions of this Court and others, as well as justice and reason, dictate that the blameless father should be awarded the custody of his child. The best interests of the child did not require the ruling of the majority: the mother had clearly demonstrated her unfitness by carrying on her illicit relations in the apartment where she and the child lived, and her teaching the child to call her paramour "daddy".

Judge Macgill has authorized me to say he concurs in this dissenting opinion.